**SEALED**

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED

SEP 06 2017

JULIA C. DUDLEY, CLERK
BY: /s/
  DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF A SEARCH OF: ) | |
| ) | Case No. 3:17-mj-00056 |
| INFORMATION ASSOCIATED WITH ) | |
| TWITTER PROFILES WITH USERNAMES ) | **UNDER SEAL** |
| @RICHARD99177842; @CWKKNIGHTS ) | |
| THAT ARE STORED AT PREMISES ) | |
| CONTROLLED BY TWITTER ) | |
| ) | |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION
FOR A WARRANT TO SEARCH AND SEIZE**

I, Christopher Hartley, being duly sworn, depose and state as follows:

**INTRODUCTION**

1. I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation ("FBI") and have been so employed since February 2016. I am assigned to the Washington Field Office, Northern Virginia Resident Agency, located in Manassas, Virginia. My principal duties include the investigation of, among other matters, civil rights violations of the United States.

2. I am a federal law enforcement officer under applicable provisions of the United States Code under Rule 41(a) of the Federal Rules of Criminal Procedure. I have received training in and have experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrants, and in executing court-ordered search warrants.

*Reviewed by Bradeny (Heg. AUSA 9-5-17*

1

3. I make this affidavit in support of an application by the United States of America for a warrant to search and seize evidence associated with Twitter accounts: **User ID: 4769608047, Username: Richard99177842, Display Name: richard preston** and **User ID: 987543524, Username: CwkKnights, Display Name: ConfederateKnights**, as further described in Attachment A.

4. Based on the information below, I submit there is probable cause to believe the aforementioned Twitter account will contain evidence, as more fully identified in Attachment B, of violations of federal law, including, but not limited to, Title 18, United States Code, Sections 245 (Federally Protected Activities), 249 (Hate Crime Acts), and 2101 (Riots).

5. Through training and experience, the Affiant has knowledge domestic terrorists and persons affiliated with white supremacists group and/or conspirators will utilize cell phones, and other electronic devices, electronic mail ("e-mail"), and social media to conduct their illegal activity and maintain contact with other confederates, conspirators and criminal associates involved with the planning, targeting, and execution of their political or social goals to include, but not limited to, espousing bias-motivated violence.

6.  The Affiant bases this affidavit upon personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officers assigned to this investigation, and upon my personal review of records, documents, and items lawfully obtained by third parties. This affidavit is not intended to include each and every fact known to me or the other investigating agencies, nor does it reflect all the evidence developed during the course of the investigation. Instead, the Affiant has set forth sufficient information to establish probable cause for the issuance of the requested search warrant. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.

## RELEVANT STATUTES

7.  *Federally Protected Activities,* Title 18, United States Code, Section 245, provides that "Whoever . . . by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with...any citizen because he is or has been . . . lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in [18 U.S.C. 245(b)(1) or 245(b)(2)], or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate..." shall be guilty of a federal offense.

8.  *Hate Crime Acts,* Title 18, United States Code, Section 249, provides in part that "[w]hoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person . . . " shall be guilty of a federal offense.

9. *Riots,* Title 18, United States Code, Section 2101, provides in part that "[w]hoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, . . . to incite a riot; or [ ] to organize, promote, encourage, participate in, or carry on a riot; or [ ] to commit any act of violence in furtherance of a riot, or [ ] to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot . . ." shall be guilty of a federal offense.

## JURISDICTION

10. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND

11. On August 12, 2017, a "Unite the Right" rally was held at Emancipation Park in Charlottesville, Virginia. The purpose of the planned rally was to protest the removal of the Robert E. Lee and Thomas "Stonewall" Jackson statues in Charlottesville, Virginia. Several groups espousing right-wing nationalist and/or white supremacist views attended the rally in support.

12. In addition, several thousand counter-protestors attended the rally to oppose the rally and its supporters. Throughout the day, several instances of violence occurred between protestors and counter-protestors. At approximately noon, the rally was declared an unlawful assembly by the Charlottesville Police Department, and both protestors and counter-protestors dispersed to separate locations.

## PROBABLE CAUSE

13. The FBI is conducting an investigation into possible violations of federal criminal law committed by RICHARD WILSON PRESTON, JR. ("PRESTON") an individual allegedly associated with right-wing extremists groups including white supremacists. The investigation was initiated following receipt of information PRESTON allegedly yelled racial epithets and fired a handgun at or in the direction of an African-American counter-protestor standing near the steps into Emancipation Park during the "Unite the Right" rally on August 12, 2017.

14. On or about August 22, 2017, the Virginia State Police ("VSP") provided a video of the aforementioned incident to the FBI to determine if a violation of federal law had been committed during the "Unite the Right" rally.

15. Based on Affiant's review of the video footage of the incident, a Caucasian male, later identified as PRESTON, is depicted departing Emancipation Park and encountering a black male counter-protestor (the "VICTIM") spraying an aerosol can. PRESTON passes and turns to face VICTIM and yells "Hey Nigger."

16. Based on further review of the video, PRESTON drew a hand gun, pointed it at the VICTIM, and attempted to fire a shot at the VICTIM as shown in the video screen shot below:



When the weapon did not fire, PRESTON lowered the hand gun, inspected weapon, and cycled the handgun slide in order to chamber a round as shown in the screenshot below:



Next, PRESTON pointed the handgun in the general direction of the VICTIM and fired one shot, missing the VICTM:

6



After firing the handgun, PRESTON turned and walked away.



17. On or about August 22, 2017, at approximately 9:00 a.m., the FBI conducted a search of Emancipation Park located at 101 E. Market Street, Charlottesville, Virginia. The FBI recovered one spent bullet from the Southwest corner of Emancipation Park.

7

18. News reports dating back to 2013 identify PRESTON's association with the Ku Klux Klan ("KKK"). A recent news article covering the August 12th "Unite the Right" rally identifies PRESTON as the Imperial Wizard of the KKK.[1]

19. PRESTON is referenced in two previously initiated domestic terrorism FBI investigations in Maryland. In those investigations, PRESTON is identified as the "Imperial Wizard" of a new KKK group in Maryland.

20. Through open source queries and logical law enforcement database searches, the FBI confirmed PRESTON is a resident of Maryland and PRESTON's phone number is 410-733-8470.

21. The FBI confirmed phone number 410-733-8470 is linked to PRESTON's Facebook and Twitter profile pages. The FBI confirmed **User ID: 4769608047, Username: Richard99177842, Displayname: richard preston** and **User ID: 987543524, Username: CwkKnights, Display Name: ConfederateKnights** are Twitter accounts associated with PRESTON.

22. Twitter owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com. Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information. Twitter also permits users create and read 140-character messages called "Tweets," and to restrict their "Tweets" to individuals whom they approve. These features are described in more detail below.

23. Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters

---

[1] http://wane.com/2017/08/14/kkk-imperial-wizard-blames-virginia-mayor-for-chaos-death/

or fewer to identify his or her Twitter account. The Twitter user may also change this username, password, and name without having to open a new Twitter account.

24. Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter. This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers. For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

25. A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile, and can also change the profile background or theme for his or her account page. In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

26. Twitter also keeps IP logs for each user. These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

27. As discussed above, Twitter users can use their Twitter accounts to post "Tweets" of 140 characters or fewer. Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter. Twitter users can also "favorite," "retweet," or reply to the Tweets of other users. In addition, when a Tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that Tweet a "mention" of the identified user. In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's

own Tweets, as well as a list of all Tweets that include the user's username (*i.e.*, a list of all "mentions" and "replies" for that username).

28. Twitter users can include photographs or images in their Tweets. Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

29. Twitter users can also opt to include location data in their Tweets, which will reveal the users' locations at the time they post each Tweet. This "Tweet With Location" function is off by default, so Twitter users must opt in to the service. In addition, Twitter users may delete their past location data.

30. When Twitter users want to post a Tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co. This link service measures how many times a link has been clicked.

31. A Twitter user can "follow" other Twitter users, which means subscribing to those users' Tweets and site updates. Each user profile page includes a list of the people who are following that user (*i.e.*, the user's "followers" list) and a list of people whom that user follows (*i.e.*, the user's "following" list). Twitters users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their Tweets are visible only to the people whom they approve, rather than to the public (which is the default setting). A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter. Twitter also provides users with a list of "Who to Follow,"

which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

32. In addition to posting Tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers. These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users. As of January 2012, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

33. Twitter users can configure the settings for their Twitter accounts in numerous ways. For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

34. Twitter includes a search function that enables its users to search all public Tweets for keywords, usernames, or subject, among other things. A Twitter user may save up to 25 past searches.

35. Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

36. If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

37. In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints. Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by

the provider or user as a result of the communications. Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

38.     As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time. Further, Twitter account activity can show how and when the account was accessed or used. For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation. Additionally, Twitter builds geo-location into some of its services. If enabled by the user, physical location is automatically added to "tweeted" communications. This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner. Last, Twitter account activity may provide relevant insight

into the Twitter account owner's state of mind as it relates to the offense under investigation. For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

39. Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

40. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Twitter to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

41. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Twitter who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

_____
Christopher J. Hartley
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this **6th** of September, 2017.

_____
Honorable Joel C. Hoppe
United States Magistrate Judge